Andrew M. Calamari
Regional Director
Lara S. Mehraban
Nancy A. Brown
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **15 Civ. 8656(JLL)** |
| | : | |
| -**against**- | : | **ECF Case** |
| | : | |
| **SAMUEL DELPRESTO, MLF GROUP, LLC** | : | **SECOND AMENDED** |
| **DONALD TOOMER, JR.,** | : | |
| **and DARREN GOODRICH** | : | **COMPLAINT** |
| | : | |
| **Defendants.** | : | |

-------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Samuel DelPresto ("DelPresto") (who, upon information and belief, currently resides

at 8 Hop Brook Lane, Holmdel, New Jersey 07733), MLF Group, LLC ("MLF") (whose

principal place of business is currently 8 Hop Brook Lane, Holmdel, New Jersey 07733),

Donald Toomer, Jr. ("Toomer") (who, upon information and belief, currently resides at 2283

Candlestick Avenue, Las Vegas, Nevada 89134) and Darren Goodrich ("Goodrich") (who, upon

information and belief, currently resides at 823 6th Street, Manhattan Beach, California 90266)

(collectively, the "Defendants"), alleges as follows:

## SUMMARY

1.      This case involves a series of fraudulent schemes designed to manipulate the market price of and demand for the stock of four issuers: BioNeutral Group, Inc. ("BONU"); NXT Nutritionals Holdings, Inc. ("NXTH"); Mesa Energy Holdings, Inc, ("MSEH"); and Clear-Lite Holdings, Inc. ("CLRH") (collectively, the "Issuers").

2.      Each of the schemes followed a similar pattern.  DelPresto and his business partner ("Individual A") identified a private company in need of financing, and orchestrated a reverse merger of it and a public shell company whose unrestricted stock DelPresto and Individual A controlled either directly, or through accounts they controlled (the "Nominees"). Once the reverse merger was consummated, DelPresto and Individual A engaged in manipulative trading and paid for promotional campaigns, both designed to engineer an attractive and rising stock price.  Once the Issuer's stock price had reached sufficiently high levels, DelPresto and Individual A sold their stock into the public market at the expense of unwitting investors.

3.      DelPresto, Individual A, and certain of the Nominees deposited certain of their unrestricted shares in brokerage accounts with Goodrich, a registered representative and market maker at a broker-dealer ("Broker-Dealer A").  Goodrich, DelPresto, Individual A and other participants in the scheme engaged in a pattern of matched trading between and amongst brokerage accounts that they controlled.  Goodrich used his role as a market maker to facilitate the coordinated and manipulative trading for the scheme.

4.      DelPresto and Individual A also recruited Toomer, an investment adviser representative, employed by the investment adviser and broker-dealer arm of a large bank ("Financial Institution 1"), to join the scheme.  Toomer agreed to an arrangement with DelPresto and Individual A in which Toomer would buy the stock of three of the Issuers (NXTH, MSEH,

and CLRH) in his clients' portfolios in exchange for receiving kickbacks of up to 10 percent of the total shares he had his clients buy.  Toomer's purchases in his clients' accounts in the open market contributed to the Issuers' rising stock price and gave the false appearance of market demand for the securities.

5.      Individual A also recruited his friends and family members (the "Friendly Investors") to open brokerage accounts to trade the Issuers' securities.  DelPresto, Individual A, and other participants in the scheme engaged in a pattern of matched trading between and amongst the Friendly Investor accounts and accounts they controlled to create the false appearance of liquidity.

6.      These fraudulent schemes generated profits of approximately $13 million for DelPresto and his entity, MLF.

7.      As agreed, DelPresto and Individual A paid Toomer kickbacks of hundreds of thousands of dollars, which Toomer described as equaling approximately 10% of the price of the Issuers' stock purchased by Toomer on behalf of his clients.

8.      Goodrich's trading in the Issuer's stock, in accounts associated with the fraudulent scheme generated at least $1,525,827 in mark-ups for Goodrich and Broker-Dealer A.

### NATURE OF THE PROCEEDING AND RELIEF SOUGHT

9.      By virtue of the foregoing conduct and as alleged further herein, DelPresto, MLF, Toomer and Goodrich, directly or indirectly, have engaged in transactions, acts, practices, and courses of business that violated Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

10.     The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] seeking a final judgment: (a) permanently restraining and enjoining the Defendants from engaging in the acts, practices and courses of business alleged herein; (b) ordering the Defendants to disgorge all ill-gotten gains with prejudgment interest thereon; (c) ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) prohibiting the Defendants from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and ordering such equitable and other relief as the Court deems just, appropriate or necessary for the benefit of investors [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].  The Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein.

12.     Venue properly lies in the District of New Jersey pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because offers, purchases and sales of certain of the securities at issue in this case took place in this district and certain of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the District of New Jersey.  DelPresto resides in this

District, MLF's principal place of business is in this District, at least two of Toomer's clients in whose accounts he bought NXTH, MSEH, and CLRH stock as alleged herein reside in this District, and at least two of the Nominees in whose accounts Goodrich traded NXTH, MSEH, and CLRH stock as alleged herein reside or have a principal place of business in the District of New Jersey.

## DEFENDANTS

13.     **DelPresto**, age 47, resides in Holmdel, New Jersey.  In 1998, DelPresto pleaded guilty to conspiracy to commit securities fraud in the District of New Jersey.

14.     **MLF** is a New Jersey limited liability company with its principal place of business in Holmdel, New Jersey.  At all relevant times, MLF was beneficially owned, controlled, and operated by DelPresto.

15.     **Toomer**, age 42, resides in Las Vegas, Nevada.  Since at least 2006, he has been licensed as both an investment adviser representative and a registered representative at Financial Institution 1.

16.     **Goodrich**, age 38, resides in Manhattan Beach, California.  From at least 2001 through 2015, he was licensed as both a market maker and registered representative at Broker-Dealer A.

## ISSUERS

17.     **BONU** is a Nevada corporation headquartered in New Jersey.  From approximately February 18, 2009 through at least August 31, 2009, BONU's common stock was quoted on the Over-the-Counter Bulletin Board ("OTC BB").  In 2009, BONU had tangible assets and revenues of less than $1 million.  BONU describes itself as a specialty chemical

company engaged in the development and commercialization of technology to neutralize environmental contaminants, toxins, and micro-organisms.

18.     **NXTH** is a Delaware corporation with its principal place of business in Holyoke, Massachusetts.  From on or about January 12, 2009 through at least May 30, 2010, NXTH's common stock was quoted on the OTC BB.  In both 2009 and 2010, NXTH had tangible assets of less than $3 million and revenues of less than $1 million.  NXTH describes itself as an alternative food and beverage development company engaged in the development of healthy alternative sweeteners.

19.     **MSEH** was a Delaware corporation with its principal place of business in Dallas, Texas.  From approximately December 14, 2009 through at least May 30, 2010, MSEH's common stock was quoted on the OTC BB.  In both 2009 and 2010, MSEH had tangible assets and revenues of less than $1 million.  MSEH described itself as an exploration stage oil and gas company.

20.     **CLRH** was a Nevada corporation with its principal place of business in Boca Raton, Florida.  From approximately July 2, 2009 through at least May 30, 2010, CLRH's common stock traded on the OTC BB, trading at less than $5.00 per share.  In both 2009 and 2010, CLRH had tangible assets of less than $1 million, recorded no revenues in 2009 and less than $1 million in 2010.  CLRH described itself as manufacturing environmentally friendly lighting products.

21.     At all relevant times, the Issuers qualified as penny stocks because they did not meet any of the exceptions to the definition of "penny stock" as defined in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.

## THE MARKET MANIPULATION SCHEMES

### THE BONU SCHEME

#### A.  DelPresto, MLF, and Individual A Obtain Control of BONU's Public Float

22.  BONU was originally incorporated in Delaware in or about 2007, under the name Moonshine Creations, Inc. ("Moonshine").  In or about February 2008, Moonshine sold approximately 635,000 shares of its common stock in a private placement.  On or about February 14, 2008, Moonshine filed Form SB-1 with the Commission, purportedly registering the private placement shares for resale.  For the purpose of perpetrating the scheme, DelPresto arranged for MLF, an entity owned by Individual A, and certain Nominees (the "BONU Control Group") to obtain control of the majority of the 635,000 shares that had been registered in the Form SB-1. As a result, the BONU Control Group controlled the majority of the company's purportedly unrestricted stock.

23.  In or about December 2008, DelPresto orchestrated a reverse merger between Moonshine and BioNeutral Laboratories Corporation USA ("Bio Labs"), a private company.  In anticipation of the reverse merger with BioLabs, Moonshine changed its name to BioNeutral Group, Inc.  In connection with the reverse merger, Moonshine's sole officer and director consented to a 30 for 1 forward stock split that resulted in turning BONU's approximately 635,000 purportedly unrestricted shares into approximately 19 million purportedly unrestricted shares, substantially all of which the BONU Control Group controlled.

24.  On or about February 18, 2009, BONU's common stock started being quoted on the OTC BB under the symbol "BONU".

**B.** **BONU Manipulative Trading**

25.     At or about the time that BONU's common stock started being quoted on the OTC BB, DelPresto and Individual A recruited Goodrich, a market maker at Broker-Dealer A, to assist them in manipulating the price and volume of BONU in furtherance of their scheme.  At Goodrich's direction, DelPresto and Individual A arranged for the majority of the BONU Control Group shares to be deposited into brokerage accounts with Goodrich's friend, a stockbroker (the "Stockbroker") at Broker-Dealer B.

26.     Beginning in or about February 2009, in preparation for the distribution of promotional mailers and the ultimate "dump" of their BONU shares, DelPresto, Individual A, and Goodrich orchestrated manipulative trading between Goodrich's market making account at Broker-Dealer A and the BONU Control Group's accounts at Broker-Dealer B to create the appearance of liquidity and demand for the stock and to inflate the price.

27.     For example, on or about February 18, 2009, the first day of trading, 100% of that day's trading volume was attributable to Individual A selling stock from his account at Broker-Dealer B on the open market to Goodrich's market making account at $1.01 and $1.05 per share.

28.     After purchasing 4,000 shares on the first day of trading, the following day, Goodrich sold approximately 17,800 shares at $1.30 per share (approximately 20% higher than the prior day's closing price), resulting in a short position in Goodrich's market making account of approximately 13,800 shares.  Goodrich covered his short position by purchasing stock from Individual A, who sold the stock at $1.30 per share from his account at Broker-Dealer B.

29.     The trades between Goodrich and Individual A were prearranged and created the false impression that there was genuine market activity in the stock.

**C.**     **The BONU Promotion and its Effect on BONU's Stock Price and Volume**

30.     In preparation for "dumping" their BONU shares, DelPresto and Individual A arranged and paid for the creation and distribution of a purportedly independent research report concerning BONU, issued in or about early March 2009.  In addition, DelPresto and Individual A hired a marketing and investment newsletter publisher (the "Publisher") to develop an internet advertising campaign which included the creation of an internet publicity newsletter.  Although these promotions did not have a dramatic effect on the volume, on or about March 5, 2009 the stock price increased to a high of $1.56 per share.

**D.**     **The BONU Scheme Falls Apart**

31.     Important to the success of the scheme was DelPresto's and Individual A's control over trading in the stock, so that they could control both the volume and price of the stock, and paint a false picture of liquidity and a rising price.  Just as the stock price was climbing to its high, on or about March 10, 2009, one of BONU's corporate managers (the "Manager"), who held BONU shares through a nominee, deviated from the scheme and sold 3,000 shares into the open market, against DelPresto's and Individual A's wishes.  On that same day, Individual A sent the Manager a text message, saying, "U need to call me…this stock will go to a penny."  Over the next few weeks, the account controlled by the Manager continued to sell stock.

32.     By in or about the end of March, Goodrich, at DelPresto's and Individual A's direction, withdrew his regular posting of quotes and as a result BONU's price plummeted to a low of approximately $.22 per share.

33.     The BONU Control Group did not trade BONU from in or about the end of March through in or about the end of June 2009.  In or about July 2009, DelPresto and Individual

A paid for another round of internet promotional campaigns which created a temporary increase in the stock price and enabled them to begin dumping their remaining BONU shares into the open market at an inflated price, yielding DelPresto total profits of approximately $749,851.

34.   From or about July 2009 through in or about August 2009, Goodrich's trading in BONU in accounts associated with the scheme generated at least $51,179 in mark-ups for Goodrich and Broker-Dealer A.

## II.   **THE NXTH SCHEME**

### A.   **DelPresto, MLF, and Individual A Obtain Control of NXTH's Public Float**

35.   NXTH was originally incorporated in Delaware in 2006, under the name Goldvale Resources, Inc. ("Goldvale").  In or about May 2006, Goldvale sold approximately 6 million shares of its common stock in a private placement.  In or about April 2007, the company completed a second private placement selling approximately 585,000 shares.  On or about November 27, 2007, Goldvale filed Form SB-2 with the Commission, purportedly registering the 6,585,000 private placement shares for resale.  For the purpose of perpetrating the scheme, DelPresto arranged for himself, MLF, an entity owned by Individual A, and certain Nominees ("NXTH Control Group") to obtain control of the majority of Goldvale's purportedly unrestricted stock.

36.   In or about December 2008, DelPresto orchestrated a reverse merger between Goldvale and NXT Nutritionals Holdings, Inc., a private company.  In anticipation of the reverse merger, Goldvale changed its name to NXT Nutritionals Holdings, Inc. ("NXT Nutritionals").  In connection with the reverse merger, the company completed a 2-for-1 forward stock split, turning the company's approximately 6,585,000 shares into approximately 13 million purportedly unrestricted shares, substantially all of which the NXTH Control Group controlled.

37.     On or about January 12, 2009, NXTH's common stock started being quoted on the OTC BB under the symbol "NXTH."

**B.      NXTH Manipulative Trading**

38.     As part of the scheme, DelPresto and Individual A arranged for the majority of the NXTH Control Group shares to be deposited into brokerage accounts with the Stockbroker at Broker-Dealer B.  DelPresto and Individual A agreed to sell Goodrich stock from their accounts at Broker-Dealer B at prearranged prices.  In certain instances, and in order to obscure the coordinated trading, Goodrich arranged with the Stockbroker to rout the orders through an alternative trading system that matches the buy and sell orders of its subscribers.  For example, on or about February 24, 2009, DelPresto and Individual A each sold 8,000 shares at $1.05 from their accounts at Broker-Dealer B through the Stockbroker.  The Stockbroker routed the sale orders through the alternative trading system.  At or around the same time, Goodrich purchased 16,000 shares at $1.05 through the alternative trading system.

39.     Beginning in or about July 2009, in preparation for the distribution of the promotional mailers and the ultimate "dump" of their NXTH shares, DelPresto, Individual A, and Goodrich arranged to transfer the NXTH Control Group's accounts at Broker-Dealer B to Goodrich at Broker-Dealer A.  Thereafter, Goodrich, at DelPresto's and Individual A's direction, orchestrated manipulative trading among the NXTH Control Group's accounts at Broker-Dealer A, Goodrich's market making account at Broker-Dealer A, and Toomer's client accounts at Financial Institution 1.

40.     DelPresto and Individual A agreed to pay Toomer cash in exchange for Toomer buying large blocks of NXTH for Toomer's clients to create the artificial appearance of liquidity and demand for NXTH.

41.     From in or about July 2009, through in or about October 2009, Toomer purchased a total of approximately 779,000 shares of NXTH common stock in his client accounts.  With DelPresto's knowledge and agreement, Individual A paid Toomer cash in exchange for making the open market purchases on behalf of his clients.

42.     For example, on or about July 16, 2009, a total of 496,000 shares of NXTH traded.  Toomer bought approximately 471,000 shares in his clients' accounts (approximately 94% of the shares purchased that day) at the prearranged price of $.99 per share from Goodrich. Goodrich moved his offer from $2.00 per share to $.99 per share to effect the transactions at the prearranged price.

43.     With DelPresto's knowledge and agreement, and to enhance the appearance of market interest in the stock, furthering the scheme, Individual A repeatedly used the Friendly Investors' passwords to trade in their accounts for them, including entering purchases on their behalf to substantially correspond to sales made from the NXTH Control Group's accounts.  For example, on or about August 6, 2009, Individual A used a Friendly Investor's online brokerage account password to enter a purchase order of 40,000 shares of NXTH at $1.21 per share.  On the same day, Individual A sold approximately the same number of shares at the exact same price -- 43,400 shares of NXTH at $1.21 per share -- from a Broker-Dealer A account that Individual A owned.

44.     In addition to fabricating the appearance of liquidity, Individual A – also with the knowledge and agreement of DelPresto -- employed certain manipulative trading tactics to gradually increase the stock price.  For instance, on or about August 20, 2009, NXTH stock opened at approximately $1.40 per share.  Individual A caused a Friendly Investor to make three

500 share purchases, each at successively higher prices—approximately $1.40, $1.50 and $1.58 (which was the highest price the stock reached in August).

45.    The manipulative trading described above had multiple goals.  First, the trading was designed to set the stage for the upcoming NXTH promotional campaign by creating the false appearance of an attractive price and volume history for the stock.  Second, by selling some of their NXTH shares to Toomer's clients, DelPresto and Individual A generated cash to fund the NXTH promotional campaign.

**C.    The NXTH Promotion and Its Effect on NXTH's Stock Price and Volume**

46.    In preparation for "dumping" their NXTH shares, DelPresto and Individual A hired the Publisher to create a large-scale promotional campaign touting NXTH.  DelPresto and Individual A paid the Publisher through third parties to hide their involvement.

47.    Between on or about September 10, 2009 and on or about October 30, 2009, at DelPresto's and Individual A's direction, the Publisher sent out millions of e-mail blasts touting NXTH, and mailed numerous glossy newsletters containing packages of NXTH's healthy alternative sweetener to potential investors.

48.    The promotion of NXTH was highly successful.  On or about January 12, 2009, when NXTH's stock started trading on the OTC BB, the stock opened at approximately $.51 per share.  From January through September 9, 2009, prior to the promotional campaign, the stock traded at an average volume of approximately 25,000 shares per day.  Once the e-mail blasts and promotional mailers had been disseminated, the volume soared, reaching a high of approximately $3.46 per share with approximately 4,531,800 shares traded on or about October 27, 2009.

49.    During the promotional campaign, and in consultation with DelPresto and Individual A, Goodrich arranged with a market maker at another broker-dealer ("Market Maker

A") to engage in a pattern of trading intended to artificially increase the reported trading volume without risk of loss to Market Maker A.  In one example of this prearranged pattern, on or about October 12, 2009, Market Maker A sold short 10,000 shares of NXTH at $2.29 per share. Goodrich then sold 10,000 shares to Market Maker A at $2.27, approximately $.02 cents per share less than the price at which Market Maker A had sold the shares, allowing Market Maker A to cover his short position at a profit.

50.     In addition, Market Maker A assisted DelPresto, Individual A, and Goodrich by providing bid support, if needed.  On or about October 27, 2009 (a day with reported trading volume of 4,531,800), at or around 1:45pm, the price of the stock began to decline precipitously from a high of $3.46 per share.  To try to keep the price from falling further, Market Maker A bought and continued to buy NXTH stock all the way down to $1.45 per share.  To cover Market Maker A's losses, after the close, Goodrich bought approximately 51,500 shares from Market Maker A at $3.02 per share, well above the closing price of the day.

51.     From in or about November 2009 through in or about January 2010, the impact of the promotional campaign began to wane, the stock price reached a low of approximately $1.15, and the trading volume began to drop.  DelPresto and Individual A, through third parties, paid the Publisher for another promotional campaign.  In or about February 2010, after the second round of e-mail blasts and promotional mailers had been disseminated, the price of the stock rebounded to a high of approximately $3.22 and a total of approximately 33,313,000 shares traded in that month.  As the manipulative activity ceased, both the stock price and the volume gradually decreased, with the price dropping to a low of approximately $.15 per share in or about April 2010.

52.     Between February 24, 2009 and March 8, 2010, DelPresto and Individual A dumped substantially all of their NXTH shares into the volume that was created on the open market by their manipulative activity, yielding DelPresto a total profit of approximately $6,900,898.

53.     Between in or about July 2009 and in or about February 2010, Goodrich's trading in NXTH in accounts associated with the scheme generated at least $692,000 in mark-ups for Goodrich and Broker-Dealer A

## III.     THE MSEH SCHEME

### A.     DelPresto, MLF, and Individual A Obtain Control of MSEH's Public Float

54.     MSEH was originally incorporated in Delaware in 2007 under the name Mesquite Mining, Inc. ("Mesquite").  In or about February 2008, Mesquite filed a Form S-1 registration statement with the Commission to offer one million shares of its common stock in a public offering.  Mesquite had a public float of approximately 1 million shares.  A micro-cap securities and transactional lawyer (the "Attorney") facilitated a transaction in which all 1 million shares were sold to the Attorney, an entity controlled by DelPresto, and an entity controlled by Individual A (the "MSEH Control Group").

55.     On or about June 19, 2009, Mesquite changed its name to Mesa Energy Holdings, Inc. in anticipation of a reverse merger with Mesa Energy, Inc., a private company.  Following a 14-to-1 forward stock split in connection with the reverse merger, the MSEH Control Group's approximately one million shares turned into approximately 14 million purportedly unrestricted shares.  Both before and after the split, the MSEH Control Group owned the majority of MSEH's unrestricted shares.

### B.      MSEH Manipulative Trading

56.      Beginning in or about January 2010, in preparation for the distribution of the promotional mailers and the ultimate "dump" of their MSEH shares, DelPresto, Individual A, Toomer, and Goodrich orchestrated manipulative trading between the MSEH Control Group's accounts and Toomer's client accounts at Financial Institution 1.

57.      For example, on or about January 5, 2010, Goodrich, at Individual A's direction and with DelPresto's knowledge and consent, caused a Friendly Investor account at Broker-Dealer A to purchase 117,000 shares of MSEH at $.76.  That same day, Individual A sold approximately 120,000 shares of MSEH at $.76 from his account at Broker-Dealer A. Goodrich's execution of these two opposite orders in accounts controlled by Individual A constituted matched trading.

58.      DelPresto and Individual A agreed to pay Toomer cash in exchange for Toomer buying large blocks of MSEH for Toomer's clients to create the artificial appearance of liquidity and demand for MSEH.

59.      In or about February 2009, Toomer purchased a total of approximately 200,000 shares of MSEH common stock in his customer accounts.  With DelPresto's knowledge and agreement, Individual A paid Toomer cash in exchange for making the open market purchases on behalf of his clients.

60.      For example, on or about February 16, 2010, Toomer purchased approximately 100,000 shares of MSEH on the open market at $1.10 per share.  On the same day, Goodrich filled Toomer's purchases by selling approximately 100,000 shares in the open market at $1.10 per share on behalf of Individual A.

61.     At various times during the relevant period, DelPresto and Individual A directed Goodrich to "sweep the offers" to move the stock price higher, with the understanding that they would protect Goodrich if his purchases resulted in Broker-Dealer A taking on too much risk. For example on March 9, 2010, following Individual A's instructions to "sweep the offers," Goodrich bought stock from $1.91 to $2.01 per share.  To protect Goodrich from the risks of such a large long position, DelPresto arranged for one of the Nominees to purchase 100,000 shares in the Nominee's account at Broker-Dealer A from Goodrich's market making account at Broker-Dealer A.

62.     The manipulative trading described above had multiple goals.  First, the trading was designed to set the stage for the upcoming MSEH promotional campaign by creating the false appearance of an attractive price and volume history for the stock.  Second, by selling some of their MSEH shares to Toomer's clients, DelPresto and Individual A generated cash to fund the MSEH promotional campaign.

**C.      The MSEH Promotion and Its Effect on MSEH's Stock Price and Volume**

63.     In preparation for "dumping" their MSEH shares, DelPresto and Individual A hired the Publisher to create a large scale promotional campaign, comprised of e-mail blasts and glossy promotional mailers, touting MSEH.  DelPresto and Individual A paid the Publisher through third parties to hide their involvement.

64.     From on or about February 22, 2010 through on or about March 31, 2010, at DelPresto's and Individual A's direction, the Publisher sent out millions of e-mail blasts and mailed numerous glossy newsletters touting MSEH to potential investors.

65.     The promotion of MSEH was extremely successful.  On or about December 14, 2009, MSEH opened on the OTC BB at approximately $1.45 per share.  From in or about

December 2009 through on or about February 19, 2010, before the promotional campaign began, the stock traded at an average volume of approximately 112,170 shares per day.  Once the e-mail blasts and promotional mailers had been disseminated, the stock price and volume soared, reaching a high of approximately $3.50, with approximately 4,448,800 shares traded on or about March 23, 2010.  As the manipulative activity ceased, both the stock price and the volume gradually decreased, with the price dropping to a low of approximately $.51 per share in or about May 2010.

66.     Between December 30, 2009 and April 26, 2010, DelPresto and Individual A dumped substantially all of their MSEH shares into the volume that was created on the open market by their manipulative activity, yielding DelPresto total profits of approximately $3,649,268.

67.     Between in or about February 2009 and in or about April 2010, Goodrich's trading in MSEH in accounts associated with the scheme generated at least $551,648 in mark-ups for Goodrich and Broker-Dealer A.

## IV.     The CLRH Scheme

### A.     DelPresto, MLF, and Individual A Obtain Control of CLRH's Public Float

68.     CLRH was originally incorporated in Nevada in or about 2006, under the name Airtime DSL ("Airtime").  In March 2007, Airtime conducted a private placement, offering approximately 5 million shares of common stock for sale, and in May 2007 Airtime conducted another private placement offering approximately 645,000 shares of common stock.  On or about October 11, 2007, Airtime filed a Form SB-2 registration statement for the resale of approximately 9,625,000 shares of Airtime's common stock, which included the two private placement offerings and approximately 4 million shares previously owned by the founder of

Airtime.  For the purpose of perpetrating the scheme, DelPresto, MLF, Individual A, an entity owned by Individual A, and certain Nominees (the "CLRH Control Group") purchased the majority of the company's purportedly unrestricted shares.

69.     In or about April 2009, DelPresto orchestrated a reverse merger between CLRH and TAG industries, Inc., a private company.  In connection with the reverse merger, Airtime declared a stock dividend giving Airtime shareholders 1.5 shares for every share they owned. After the stock dividend, the company had approximately 24,062,500 purportedly unrestricted shares outstanding and Airtime changed its name to Clear-Lite.  The CLRH Control Group owned the majority of the purportedly unrestricted shares of CLRH.  On or about July 23, 2009, CLRH's common stock started being quoted on the OTC BB under the symbol "CLRH".

**B.       CLRH Manipulative Trading**

70.     As part of the scheme, DelPresto and Individual A arranged for the majority of the CLRH Control Group shares to be deposited into brokerage accounts with Goodrich at Broker-Dealer A.  With DelPresto's knowledge and consent, Goodrich was responsible for facilitating the coordinated trades between the CLRH Control Group's accounts, the Friendly Investors' accounts, and Toomer's client accounts.

71.     Beginning in or about October 2009, in preparation for the distribution of the promotional mailers and the ultimate "dump" of their CLRH shares, DelPresto, Individual A, Toomer, and Goodrich orchestrated manipulative trading between the CLRH Control Group's accounts and Toomer's client accounts at Financial Institution 1.

72.     DelPresto and Individual A agreed to pay Toomer cash in exchange for Toomer buying large blocks of CLRH for Toomer's clients to create the artificial appearance of liquidity and demand for CLRH.

73.     In or about October 2009, Toomer purchased a total of approximately 1.2 million shares of CLRH in his client accounts.  With DelPresto's knowledge and agreement, Individual A paid Toomer cash in exchange for making the open market purchases on behalf of his clients.

74.     For example, on or about October 20, 2009, Toomer bought approximately 200,000 shares of CLRH on the open market at $1.06 per share on behalf of his clients.  On the same day, Goodrich filled Toomer's purchases by selling 56,440 shares of CLRH on behalf of MLF, 129,000 shares of CLRH on behalf of Individual A, and 50,000 shares from a Nominee account.

75.     On November 23, 2009, following Individual A's instructions to "sweep the offers," Goodrich purchased the stock offered at each price ranging from $1.58 through $1.66 and bought approximately 80,000 shares more than he sold.  That day, to protect Goodrich from risk, DelPresto and Individual A arranged for a Nominee account at Broker-Dealer A to purchase 80,000 shares of stock from Goodrich's market-making account at Broker Dealer A for $1.64 per share.

76.     The manipulative trading described above had multiple goals.  First, the trading was designed to set the stage for the upcoming CLRH promotional campaign by creating the false appearance of an attractive price and volume history for the stock.  Second, by selling some of their CLRH shares to Toomer's clients, DelPresto and Individual A generated cash to fund the CLRH promotional campaign.

### C.     The CLRH Promotion and Its Effect on CLRH's Stock Price and Volume

77.     In preparation for "dumping" their CLRH shares, DelPresto and Individual A paid the Publisher, through third parties, to create a large scale promotional campaign touting CLRH.

78.     From on or about October 2009 through December 2009, at DelPresto's and Individual A's direction, the Publisher sent out promotional mailers and millions of e-mail blasts touting CLRH.

79.     The promotion of CLRH was successful.  On or about July 23, 2009, prior to the promotional campaign, when CLRH's stock starting trading on the OTC BB, the stock opened at approximately $1.01 per share.  From July through on or about September 30, 2009, before the promotional campaign began, the stock traded an average volume of approximately 2,200 shares per day.  Once the e-mail blasts and promotional mailers had been disseminated, the volume soared, reaching a high of approximately 1,586,500 shares traded on October 21, 2009.  The stock price also increased dramatically, reaching a high of approximately $2.07 per share on or about November 16, 2009.

80.     From in or about January 2010 through on or about March 30, 2010, the impact of the promotion began to wane, the trading volume began to drop and the stock price reached a low of approximately $1.00.  DelPresto and Individual A, through third parties, paid the Publisher for another promotional campaign.  In or about April, after the second round of e-mail blasts and promotional mailers had been disseminated, the price of the stock rebounded to a high of approximately $1.76 per share and a total of approximately 40,874,700 shares traded.  As the manipulative activity ceased, both the stock price and the volume gradually decreased, with the price dropping to a low of approximately $.10 per share in or about May 2010.

81.     Between August 14, 2009 and April 14, 2010, DelPresto and Individual A dumped substantially all of their CLRH shares into the volume that was created on the open market by their manipulative activity, yielding DelPresto total profits of approximately $1,759,852.

82.    From in or about July 2009 through in or about April 2010, Goodrich's trading in CLRH in accounts associated with the scheme generated at least $231,000 in mark-ups for Goodrich and Broker-Dealer A.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a)(1) of the Securities Act
### (DelPresto, MLF, and Goodrich)

83.    Paragraphs 1 through 82 are incorporated by reference as if set forth fully herein.

84.    By virtue of the foregoing, DelPresto, MLF, and Goodrich, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of BONU, NXTH, MSEH, and CLRH securities, knowingly or recklessly employed devices, schemes, or artifices to defraud.

85.    By virtue of the foregoing, DelPresto, MLF, and Goodrich violated and, unless restrained and enjoined, will again violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(1) of the Securities Act
### (Toomer)

86.    Paragraphs 1 through 82 are incorporated by reference as if set forth fully herein.

87.    By virtue if the foregoing, DelPresto, MLF, and Goodrich, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of BONU, NXTH, MSEH, and CLRH securities, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

### THIRD CLAIM FOR RELIEF
### Violations of Section 17(a)(3) of the Securities Act
### (DelPresto, MLF, and Goodrich)

88.    Paragraphs 1 through 82 are incorporated by reference as if set forth fully herein.

89.    By virtue of the foregoing, DelPresto, MLF, and Goodrich, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of BONU, NXTH, MSEH, and CLRH securities, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

90.    By virtue of the foregoing, DelPresto, MLF, and Goodrich violated and, unless restrained and enjoined, will again violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]

### FOURTH CLAIM FOR RELIEF
### Violations of Section 17(a)(3) of the Securities Act
### (Toomer)

91.    Paragraph 1 through 82 are incorporated by reference as if set forth fully herein.

92.    By virtue of the foregoing, Toomer, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of NXTH, MSEH, and CLRH securities engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

93.    By virtue of the foregoing, Toomer violated and, unless restrained and enjoined, will again violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## FIFTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and 10b-5(c) Thereunder
### DelPresto, MLF and Goodrich

94.  Paragraphs 1 through 82 are incorporated by reference as if set forth fully herein.

95.  By virtue of the foregoing, DelPresto, MLF, and Goodrich, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of BONU, NXTH, MSEH, and CLRH securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly employed devices, schemes, or artifices to defraud; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

96.  By virtue of the foregoing, DelPresto, MLF, and Goodrich violated and, unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)].

## SIXTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and 10b-5(c) Thereunder
### (Toomer)

97.  Paragraphs 1 through 82 are incorporated by reference as if set forth fully herein.

98.  By virtue of the foregoing, Toomer, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of NXTH, MSEH, and CLRH securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly employed devices, schemes, or artifices to defraud; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

99.  By virtue of the foregoing, Toomer violated and, unless restrained and enjoined,

will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining DelPresto, MLF, Toomer, and Goodrich, their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Ordering DelPresto, MLF, Toomer, and Goodrich to disgorge all ill-gotten gains received directly or indirectly as a result of the violative conduct alleged herein, and to pay prejudgment interest thereon.

**III.**

Ordering DelPresto, MLF, Toomer, and Goodrich to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], prohibiting DelPresto, MLF, Toomer, and Goodrich from participating in any offering of penny stock; and

## V.

Granting such other and further relief as this Court deems just and appropriate.

Dated:        November 17, 2016
              New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
    Lara S. Mehraban
    Associate Regional Director
    Securities and Exchange Commission
    200 Vesey Street, Suite 400
    New York, New York 10281-1022
    *Admitted in the U.S. District Court for the*
    *Southern District of New York*
    (212) 336-1023 (Brown)
    Email: BrownN@sec.gov
    Attorney for Plaintiff

Local Counsel:
Leticia B. Vandehaar
Deputy Chief, Civil Division
United States Attorney's Office
District of New Jersey
970 Broad Street, Ste. 700
Newark, New Jersey 07102
*Designated Pursuant to Local Rule 101.1(f)*

Of Counsel:
Andrew M. Calamari, Regional Director
Adam S. Grace
Wendy B. Tepperman
Nancy A. Brown
Rhonda L. Jung
Teresa A. Rodriguez